1 | **SARA M. PELOQUIN**
California State Bar No.254945
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, California  92101-5008
Telephone:  (619) 234-8467
4 | sara_peloquin@fd.org

5 | Attorneys for Mr. Jose Manuel Armenta-Leyva

6

7

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | **(HONORABLE BARRY TED MOSKOWITZ)**

11 |

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO.08CR0535-BTM |
| Plaintiff, | ) |
| | ) DATE:        April 11, 2008 |
| v. | ) TIME:        1:30 p.m. |
| | ) |
| JOSE MANUEL ARMENTA-LEYVA, | ) STATEMENT OF FACTS AND |
| | ) MEMORANDUM OF POINTS AND |
| Defendant. | ) AUTHORITIES IN SUPPORT OF |
| _____ | ) <u>MR. ARMENTA-LEYVA'S MOTIONS</u> |

**I.**

**<u>STATEMENT OF FACTS</u>**

The following statement of facts is based on materials received from the government.  Mr. Armenta-Leyva does not accept this statement of facts as his own, and reserves the right to take a contrary position at motion hearings and trial.  The facts alleged in these motions are subject to amplification and/or modification at the time these motions are heard.

Mr. Armenta-Leyva was arrested on January 31, 2008.   On February 27, 2008, the January 2007 Grand Jury returned a one count indictment charging a violation of 8 U.S.C. § 1326.

These motions follow.

/ / /

/ / /

/ / /

## II.

## MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE

Mr. Armenta-Leyva  moves for the production of the following discovery.  This request is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies."  See United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

(1)    Mr. Armenta-Leyva's Statements.  The government must disclose to Mr. Armenta-Leyva all copies of any written or recorded statements made by him; the substance of any statements made by Mr. Armenta-Leyva which the government intends to offer in evidence at trial -- either in its case-in-chief or in rebuttal; see Id., any response by him to interrogation; the substance of any oral statements which the government intends to introduce at trial and any written summaries of Mr. Armenta-Leyva's oral statements contained in the handwritten notes of the government agent; any response to any Miranda warnings which may have been given to him; as well as any other statements by Mr. Armenta-Leyva.  Fed. R. Crim. P. 16(a)(1)(A)[1].  Mr. Armenta-Leyva specifically requests production of a copy of the taped proceedings and any and all documents memorializing the deportation proceedings allegedly held and any other proceedings that the government intends to rely upon at trial. The Advisory Committee Notes and the 1991 Amendments to Rule 16 make clear that the Government must reveal all the accused's statements, whether oral or written, regardless of whether the government intends to make any use of those statements.  Federal Rule of Criminal Procedure 16 is designed "to protect the defendant's rights to a fair trial."  United States v. Rodriguez, 799 F.2d 649 (11th Cir. 1986); see also United States v. Noe, 821 F.2d 604, 607 (11th Cir. 1987) (reversing conviction for failure to provide statements offered in rebuttal -- government's failure to disclose statements made by the defendant is a serious detriment to preparing trial and defending against criminal charges).

(2)    Arrest Reports and Notes. Mr. Armenta-Leyva also specifically requests that the government turn over all arrest reports, notes and TECS records not already produced that relate to the circumstances surrounding his arrest or any questioning.  This request includes, but is not limited to, any rough notes, records, reports, transcripts, referral slips, or other documents in which statements of Mr. Armenta-Leyva or

---

[1]  Of course, any of Mr. Armenta-Leyva's statements, which are exculpatory, must be produced, as well.  See Brady v. Maryland, 373 U.S. 83 (1963).

any other discoverable material is contained.  Such material is discoverable under Fed. R. Crim. P. 16(a)(1)(A) and <u>Brady v. Maryland</u>.  The government must produce arrest reports, investigators' notes, memos from arresting officers, sworn statements, and prosecution reports pertaining to the defendant.  <u>See</u> Fed. R. Crim. P. 16(a)(1)(B) and (C), 26.2 and 12(I); <u>United States v. Harris</u>, 543 F.2d 1247, 1253 (9th Cir. 1976) (original notes with suspect or witness must be preserved); <u>see also</u> <u>United States v. Anderson</u>, 813 F.2d 1450, 1458 (9th Cir. 1987) (reaffirming <u>Harris</u>' holding).

(3)  <u>Brady Material</u>.  Mr. Armenta-Leyva requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case.  <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995).   Under <u>Brady</u>, <u>Kyles</u> and their progeny, impeachment, as well as exculpatory evidence, falls within the definition of evidence favorable to the accused. <u>See also</u> <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976).  This includes information obtained from other investigations which exculpates Mr. Armenta-Leyva.

(4)  <u>Any Information That May Result in a Lower Sentence Under The Guidelines</u>.   The government must also produce this information under <u>Brady v. Maryland</u>.  This request includes any cooperation or attempted cooperation by Mr. Armenta-Leyva, as well as any information, including that obtained from other investigations or debriefings, that could affect any base offense level or specific offense characteristic under Chapter Two of the Guidelines.  Mr. Armenta-Leyva also requests any information relevant to a Chapter Three adjustment, a determination of his criminal history, and information relevant to any other application of the Guidelines.

(5)  <u>Mr. Armenta-Leyva's Prior Record</u>.  Mr. Armenta-Leyva requests disclosure of his prior record.  Fed. R. Crim. P. 16(a)(1)(D).

(6)  <u>Any Proposed 404(b) Evidence</u>.  The government must produce evidence of prior similar acts under Fed. R. Crim. P. 16(a)(1)(D) and Fed. R. Evid. 404(b) and 609.  In addition, "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature" of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial and the purpose for which introduction is sought.  This applies not only to evidence which the government may seek to introduce in its case-in-chief, but also to evidence which the government may use as rebuttal.  <u>See</u> <u>United States v. Vega</u>, 188 F.3d 1150 (9th Cir. 1999).  Mr. Armenta-Leyva is entitled to "reasonable notice" so as to "reduce

1  surprise," preclude "trial by ambush" and prevent the "possibility of prejudice." Id.; United States v. Perez-

2  Tosta, 36 F.3d 1552, 1560-61 (11th Cir. 1994). Mr. Armenta-Leyva requests such reasonable notice at least

3  two weeks before trial so as to adequately investigate and prepare for trial.

4    (7)  Evidence Seized. Mr. Armenta-Leyva requests production of evidence seized as a result of

5  any search, either warrantless or with a warrant. Fed. R. Crim. P. 16(a)(1)(E).

6    (8)  Request for Preservation of Evidence. Mr. Armenta-Leyva specifically requests the

7  preservation of any and all physical evidence that may be destroyed, lost, or otherwise put out of the

8  possession, custody, or care of the government and which relates to the arrest or the events leading to the

9  arrest in this case. This request includes, but is not limited to, the results of any fingerprint analysis,

10  Mr. Armenta-Leyva's personal effects, and any evidence seized from Mr. Armenta-Leyva or any third party

11  in relation to this case.

12    In addition, Mr. Armenta-Leyva requests that the Assistant United States Attorney assigned to this

13  case oversee a review of all personnel files of each agent involved in the present case for impeachment

14  material. Kyles, 514 U.S. at 419; United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991); United States v.

15  Lacy, 896 F.Supp. 982 (N.D. Ca. 1995). At a minimum, the prosecutor has the obligation to inquire of his

16  agents in order to ascertain whether or not evidence relevant to veracity or other impeachment exists.

17    (9)  Tangible Objects. Mr. Armenta-Leyva requests the opportunity to inspect and copy, as well

18  as test, if necessary, all other documents and tangible objects, including photographs, books, papers,

19  documents, fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or

20  intended for use in the government's case-in-chief or were obtained from or belong to Mr. Armenta-Leyva.

21  Fed. R. Crim. P. 16(a)(1)(E). Specifically, to the extent they were not already produced, Mr. Armenta-Leyva

22  requests copies of all photographs in the government's possession, including, but not limited to, photographs

23  of himself and any other photos taken in connection with this case.

24    (10)  Expert Witnesses. Mr. Armenta-Leyva requests the name, qualifications, and a written

25  summary of the testimony of any person that the government intends to call as an expert witness during its

26  case in chief. Fed. R. Crim. P. 16(a)(1)(G). The defense requests that notice of expert testimony be provided

27  at a minimum of two weeks prior to trial so that the defense can properly prepare to address and respond to

28  this testimony, including obtaining its own expert and/or investigating the opinions and credentials of the

1    government's expert.  The defense also requests a hearing in advance of trial to determine the admissibility

2    of qualifications of any expert.  See Kumho v. Carmichael Tire Co. 119 S. Ct. 1167, 1176 (1999) (trial judge

3    is "gatekeeper" and must determine reliability and relevancy of expert testimony and such determinations may

4    require "special briefing or other proceedings . . .").

5         (11)  Evidence of Bias or Motive to Lie.  Mr. Armenta-Leyva requests any evidence that any

6    prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify or

7    distort his or her testimony.

8         (12)  Impeachment Evidence.  Mr. Armenta-Leyva requests any evidence that any prospective

9    government witness has engaged in any criminal act whether or not resulting in a conviction and whether any

10   witness has made a statement favorable to the defendant.  See Fed. R. Evid. 608, 609 and 613; Brady v.

11   Maryland.

12        (13)  Evidence of Criminal Investigation of Any Government Witness.  Mr. Armenta-Leyva

13   requests any evidence that any prospective witness is under investigation by federal, state or local authorities

14   for any criminal conduct.

15        (14)  Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling.  The

16   defense requests any evidence, including any medical or psychiatric report or evaluation, that tends to show

17   that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and

18   any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an

19   alcoholic.

20        (15)  Jencks Act Material.  Mr. Armenta-Leyva requests production in advance of trial of all

21   material, including any tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. §

22   3500; Fed. R. Crim. P. 26.2.  Advance production will avoid the possibility of delay at Mr. Armenta-Leyva's

23   request to investigate the Jencks material.  A verbal acknowledgment that "rough" notes constitute an accurate

24   account of the witness' interview is sufficient for the report or notes to qualify as a statement under section

25   3500(e)(1).  Campbell v. United States, 373 U.S. 487, 490-92 (1963); see also United States v. Boshell, 952

26   F.2d 1101 (9th Cir. 1991) (holding that, where an agent goes over interview notes with subject, interview

27   notes are subject to Jencks Act).

28        (16)  Giglio Information.  Pursuant to Giglio v. United States, 405 U.S. 150 (1972), Mr. Armenta-

1 Leyva requests all statements and/or promises, express or implied, made to any government witnesses, in
2 exchange for their testimony in this case, and all other information which could arguably be used for the
3 impeachment of any government witnesses.

4      (17)  <u>Agreements Between the Government and Witnesses</u>.  In this case, Mr. Armenta-Leyva
5 requests identification of any cooperating witnesses who have committed crimes, but were not charged, so
6 that they may testify for the government in this case.  Mr. Armenta-Leyva also requests discovery regarding
7 any express or implicit promise; understanding; offer of immunity; past, present, or future compensation; or
8 any other kind of agreement or understanding, including any implicit understanding relating to criminal or
9 civil income tax, forfeiture or fine liability between any prospective government witness and the government
10 (federal, state and/or local).  This request also includes any discussion with a potential witness about, or
11 advice concerning, any contemplated prosecution, or any possible plea bargain, even if no bargain was made,
12 or the advice not followed.

13      Pursuant to <u>United States v. Sudikoff</u>, 36 F.Supp.2d 1196 (C.D. Cal. 1999), the defense requests
14 <u>all</u> statements made, either personally or through counsel, <u>at any time</u>, which relate to the witnesses'
15 statements regarding this case, any promises -- implied or express -- regarding punishment/prosecution or
16 detention of these witnesses, any agreement sought, bargained for or requested, on the part of the witness at
17 any time.

18      (18)  <u>Informants and Cooperating Witnesses</u>. Mr. Armenta-Leyva requests disclosure of the names
19 and addresses of all informants or cooperating witnesses used, or to be used, in this case, and in particular,
20 disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime
21 charged against Mr. Armenta-Leyva.  The government must disclose the informant's identity and location, as
22 well as the existence of any other percipient witness unknown or unknowable to the defense.  <u>Roviaro v.</u>
23 <u>United States</u>, 353 U.S. 53, 61-62 (1957).  The government must disclose any information derived from
24 informants which exculpates or tends to exculpate Mr. Armenta-Leyva.

25      (19)  <u>Bias by Informants or Cooperating Witnesses</u>.  Mr. Armenta-Leyva requests disclosure of
26 any information indicating bias on the part of any informant or cooperating witness.  <u>Giglio v. United States</u>.
27 Such information would include what, if any, inducements, favors, payments or threats were made to the
28 witness to secure cooperation with the authorities.

1    (20)   Inspection and Copying of A-File.  Mr. Armenta-Leyva requests that this Court order the

2  government to make all A-Files relevant to Mr. Armenta-Leyva  available for inspection and copying.

3    (21)   Residual Request.  Mr. Armenta-Leyva intends, by this discovery motion, to invoke his rights

4  to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution

5  and laws of the United States.  Mr. Armenta-Leyva requests that the government provide his attorney with

6  the above-requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-

7  examination.

8                                          **III.**

9      **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S**
    **INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY**
10  **RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH**
    **AMENDMENT BY DEPRIVING MR. ARMENTA-LEYVA OF THE TRADITIONAL**
11                        **FUNCTIONING OF THE GRAND JURY**

12    **A.    Introduction.**

13        The indictment in the instant case was returned by the January 2007 grand jury.  See CR at

14  6.[2] That grand jury was instructed by Judge Burns on January 11, 2007.  See Reporter's Partial Transcript of

15  the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A.  Judge Burns's

16  instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases

17  challenging a form grand jury instruction previously given in this district in several ways.[3] These instructions

18  compounded Judge Burns's erroneous instructions and comments to prospective grand jurors during voir dire

19  of the grand jury panel, which immediately preceded the instructions at Ex. A.  See Reporter's Transcript of

20  Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[4]

21

22        [1] "CR" refers to the Clerk's Record in Case Number 07CR2364-LAB.

23        [2] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States
24  v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-
    Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United
25  States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

26        [3] The transcript of the voir dire indicates that grand jurors were shown a video presentation
27  on the role of the grand jury.  Mr. Arredondo-Ortiz requests that the video presentation be produced.
    See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the
28  grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are
    not.").

1.    **Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[5] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" See id. at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which it excused three potential jurors. See id. at 8.

> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id. That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their disagreement with Congress. See id. at 8-9. Thus, the Court not only instructed the grand jurors on its view of their discretion; it enforced that view on pain of being excused from service as a grand juror.

Examination of the recently disclosed voir dire transcript, which contains additional instructions and commentary in the form of the give and take between Judge Burns and various prospective grand jurors, reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause exists and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire. In one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable

---

[5]    [4] See also id. at 20 ("You're all about probable cause.").

1
2
belief that the person that they propose that we indict committed the crime?"

3
4
If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

5   See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear

6   that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when

7   it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

8   committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

9   crime."

10   Equally revealing is Judge Burns's interactions with two potential grand jurors who indicated that,

11   in some unknown set of circumstances, they might decline to indict even where there was probable cause.

12   Because of the redactions of the grand jurors' names, Mr. Arredondo-Ortiz will refer to them by occupation.

13   One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter

14   REA).  The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions

15   were not an effective use of resources.  See id. at 16.  The CSW was also troubled by certain unspecified

16   immigration cases.  See id.

17   Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the

18   CSW.  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this

19   district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.

20   Rather, Judge Burns provided instructions suggesting that, in any event, any scruples CSW may have

21   possessed were simply not capable of expression in the context of grand jury service.

22
23
24
25
26
Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment.  If there's probable cause, then the case should go forward.  *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that is your frame of mind, the probably you shouldn't serve.  Only you can tell me that.

27   See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let

28   the grand juror know that it would not want him or her to decline to indict in an individual case where the

1    grand juror "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.

2    See id. Such a case "should go forward." See id. Given that blanket proscription on grand juror discretion,

3    made manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to

4    support a charge even if [the CSW] thought the evidence warranted it." See id. Again, Judge Burns's

5    question provided no context; it inquired regarding "a case," a term presumably just as applicable to

6    possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for

7    distribution. Any grand juror listening to this exchange could only conclude that there was *no* case in which

8    Judge Burns would permit them to vote "no bill" in the face of a showing probable cause.

9           Just in case there may have been a grand juror that did not understand his or her inability to exercise

10    anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA. REA

11    first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

12    "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about medical

13    marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

14    considerations into account.

15               Well, those things -- the consequences of your determination shouldn't
                 concern you in the sense that penalties or punishment, things like that -- we
16               tell trial jurors, of course, that they cannot consider the punishment or the
                 consequence that Congress has set for these things. We'd ask you to also
17               abide by that. We want you to make a business-like decision of whether
                 there was a probable cause. . . .
18

19    Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge

20    Burns went on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

21           In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See

22    id. That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a

23    grand juror is obligated to vote to indict if there is probable cause.

24               I can tell you sometimes I don't agree with some of the legal decisions that
                 are indicated that I have to make. But my alternative is to vote for someone
25               different, vote for someone that supports the policies I support and get the
                 law changed. It's not for me to say, "well, I don't like it. So I'm not going
26               to follow it here."

27               You'd have a similar obligation as a grand juror even though you might
                 have to grit your teeth on some cases. Philosophically, if you were a
28               member of congress, you'd vote against, for example, criminalizing
                 marijuana. I don't know if that's it, but you'd vote against criminalizing
                 some drugs.

1    That's not what your prerogative is here.  You're prerogative instead is to
     act like a judge and say, "all right.  This is what I've to  deal with
2    objectively.  Does it seem to me that a crime was committed?  Yes.  Does
     it seem to me that this person's involved?  It does."  *And then your*
3    *obligation, if you find those to be true, would be to vote in favor of the case*
     *going forward.*

4

5    Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test,

6    which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

7    Having set forth the duty to indict, and being advised that REA was "uncomfortable" with

8    that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the

9    obligation to indict in every case in which there was probable cause.

10   The Court: Do you think you'd be inclined to let people go in drug cases
     even though you were convinced there was probable cause they committed
11   a drug offense?
     REA: It would depend on the case.
12   The Court: Is there a chance that you would do that?
     REA: Yes.
13   The Court: I appreciate your answers.  I'll excuse you at this time.

14   Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely

15   on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id.,

16   as it should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote

17   to indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, Judge

18   Burns made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA to

19   hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to indict

20   because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[6]

21   See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict was too great

22   a risk to run.

23

24   ─────────────────────

25   ⁶   ⁵ This point is underscored by Judge Burns's explanation to the Grand Jury that a
     magistrate judge will have determined the existence of probable cause "in most circumstances"
26   before it has been presented with any evidence.  See Ex. A at 6.  This instruction created an
     imprimatur of finding probable cause in each case because had a magistrate judge not so found, the
27   case likely would not have been presented to the Grand Jury for indictment at all.  The Grand Jury
     was informed that it merely was redundant to the magistrate court "in most circumstances."  See id.
28   This instruction made the grand jury more inclined to indict irrespective of the evidence presented.

### 2.  The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex. A at 20.[7]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury.  You're all about probable cause.  If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire.  After advising the grand jurors that

---

[7] [6]These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27.  The instructions delivered during voir dire go even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense to me."  See id. at 43.  See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys.  See Ex. A at 9-10.  Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, Judge Burns would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked."  See Ex. A at 12.  As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors."  Navarro-Vargas, 408 F.3d at 1215.  The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court.  See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

1  "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns

2  gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something

3  adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus,

4  Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was

5  "adverse" or "that cuts against the charge." See id.

6      **B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

7

8          The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions

9  given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While

10 the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly

11 formalistic approach[8] to the problems posed by the instructions, endorsed many of the substantive arguments

12 raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role

13 of the grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to

14 the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the

15 direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and

16 utterly unable to exercise any quasi-prosecutorial discretion. That is not the institution the Framers

17 envisioned. See United States v. Williams, 504 U.S. 36, 49 (1992).

18          For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

19 II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

20 deciding whether a particular prosecution shall be instituted or followed up, performs much the same function

21 as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510

22 (1978)). Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

23 I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

24 prosecutorial." ). See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that

25 the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but

26 ───────────

27          [8] [7] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
   majority because "[t]he instruction's use of the word 'should' is most likely to be understood as
28 imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's
   constitutional independence.").

1  also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the

2  prosecutor." Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of

3  the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was

4  "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted

5  that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure

6  § 15.2(g) (2d ed. 1999)).

7          Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

8  in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

9          The grand jury thus determines not only whether probable cause exists, but
           also whether to "charge a greater offense or a lesser offense; numerous
10         counts or a single count; and perhaps most significant of all, a capital
           offense or a non-capital offense -- all on the basis of the same facts.  And,
11         significantly, the grand jury may refuse to return an indictment even
           "'where a conviction can be obtained.'"

12

13  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's

14  description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand

15  jury "controls not only the initial decision to indict, but also significant questions such as how many counts

16  to charge and whether to charge a greater or lesser offense, including the important decision whether to charge

17  a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-Vargas

18  II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to

19  refuse to indict someone even when the prosecutor has established probable cause that this individual has

20  committed a crime." See id. at 1214 (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899

21  (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam)

22  (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the

23  Ninth Circuit.  But not in Judge Burns's instructions.

24      **C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury
              Discretion Established in Both Vasquez and Navarro-Vargas II.**

25

26          The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

27  jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision

28  in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every

1  finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at

2  1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge Hawkins ably

3  pointed out. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use

4  of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand

5  jurors, and thus to circumscribe the grand jury's constitutional independence."). See also id. ("The 'word'

6  should is used to express a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide

7  1579 (1999) (brackets in original)).

8          The debate about what the word "should" means is irrelevant here; the instructions here make no

9  such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not

10 choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

11 disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

12 indicting even though I think that the evidence is sufficient'...." See Ex. A at 8-9. Thus, the instruction flatly

13 bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror

14 would read this language as instructing, or even allowing, him or her to assess "the need to indict." Vasquez,

15 474 U.S. at 264.

16         While Judge Burns used the word "should" instead of "shall" during voir dire with respect to

17 whether an indictment was required if probable cause existed, see Ex. B at 4, 8, in context, it is clear that

18 Judge Burns could only mean "should" in the obligatory sense. For example, when addressing a prospective

19 juror, Judge Burns not only told the jurors that they "should" indict if there is probable cause, it told them that

20 if there is not probable cause, "then the grand jury should hesitate and not indict." See id. at 8. At least in

21 context, it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving

22 room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at

23 1205. Clearly Judge Burns was not.

24         The full passage cited above effectively eliminates any possibility that Judge Burns intended the

25 Navarro-Vargas spin on the word "should."

26             [T]he grand jury is determining really two factors: "do we have a reasonable
               belief that a crime was committed? And second, do we have a reasonable
27             belief that the person that they propose that we indict committed the
               crime?"

28

1          If the answer is "yes" to both of those, then the case should move forward.
      If the answer to either of the questions is "no," then the grand jury should
2          not hesitate and not indict.

3        See Ex. B at 8. Of the two sentences containing the word "should," the latter of the two essentially

4    states that if there is no probable cause, you *should* not indict. Judge Burns could not possibly have intended

5    to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408

6    F.3d at 1205 (citing Marcucci, 299 F.3d at 1159). That would contravene the grand jury's historic role of

7    protecting the innocent. See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

8    "responsibilities continue to include both the determination whether there is probable cause and the protection

9    of citizens against unfounded criminal prosecutions.") (citation omitted).

10       By the same token, if Judge Burns said that "the case should move forward" if there is probable

11   cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

12   Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then Judge Burns would have to have

13   intended two different meanings of the word "should" in the space of two consecutive sentences. That could

14   not have been his intent. But even if it were, no grand jury could ever have had that understanding.[9] Jurors

15   are not presumed to be capable of sorting through internally contradictory instructions. See generally United

16   States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

17   presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

18       Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

19   clear to the grand jurors that "should" was not merely suggestive, but obligatory:

20       **(1)**    The first occasion occurred in the following exchange when Judge Burns conducted voir dire

21   and excused a potential juror (CSW):

22         The Court: . . . If there's probable cause, then the case should go forward.
      I wouldn't want you to say, "Well, yeah, there's probable cause. But I still
23         don't like what the government is doing. I disagree with these laws, so I'm
      not going to vote for it to go forward." If that's your frame of mind, then
24         probably you shouldn't serve. Only you can tell me that.
      Prospective Juror: Well, I think I may fall in that category.
25         The Court: In the latter category?

26   _____

27       [9]  [8]  This argument does not turn on Mr. Armenta-Leyva's view that the Navarro-Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible.
28   Rather, it turns on the context in which the word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

08CR0535-BTM

1   Prospective Juror: Yes.
    The Court: Where it would be difficult for you to support a charge even if
2   you thought the evidence warranted it?
    Prospective Juror: Yes.
3   The Court: I'm going to excuse you then.

4       See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a

5   prospective juror.  Even if the prospective juror did not like what the government was doing in a particular

6   case, that case "should go forward" and Judge Burns expressly disapproved of any vote that might prevent

7   that.  See id. ("I wouldn't want you [to vote against such a case]").  The sanction for the possibility of

8   independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and

9   secondary deterrence as to the exercise of discretion by any other prospective grand juror.

10      **(2)**    In an even more explicit example of what "should" meant, Judge Burns makes clear that it

11  there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative.

12      Court        . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

13      You'd have a similar *obligation* as a grand juror even though you might
        have to grit your teeth on some cases.  Philosophically, if you were a
14      member of Congress, you'd vote against, for example, criminalizing
        marijuana.  I don't know if that's it, but you'd vote against criminalizing
15      some drugs.

16      That's not what your *prerogative* is here.  Your prerogative instead is act
        like a judge and to say, "All right.  This is what I've got to deal with
17      objectively.  Does it seem to me that a crime was committed?  Yes.  Does
        it seem to me that this person's involved?  It does."  *And then your*
18      *obligation, if you find those things to be true, would be to vote in favor of*
        *the case going forward.*

19

20      Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and

21  prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even

22  though you were convinced there was probable cause they committed a drug offense?" Id. at 27.  The potential

23  juror responded: "It would depend on the case." Id.  Nevertheless, that juror was excused. Id. at 28.  Again,

24  in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and

25  the juror has no prerogative to do anything other than indict if there is probable cause.

26      Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

27  a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but

28  rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not

1    indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the

2    prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

3    scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled the

4    prospective jurors, because his message is that there is no discretion not to indict.

5         **(3)**    As if the preceding examples were not enough, Judge Burns continued to pound the point

6    home that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist

7    on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws

8    here."  See id. at 61.

9         **(4)**    And then again, after swearing in all the grand jurors who had already agreed to indict in

10   every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when it

11   reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think

12   that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what

13   the law ought to be and try to impose that through applying it in a grand jury setting."  See Ex. A at 9.

14        Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

15   penalties to which indicted persons may be subject.

16             Prospective Juror (REA): ... And as far as being fair, it kind of depends on
             what the case is about because there is a disparity between state and federal
17             law.
             The Court:  In what regard?
18             Prospective Juror: Specifically, medical marijuana.
             The Court:  Well, those things -- the consequences of your determination
19             shouldn't concern you in the sense that penalties or punishment, things like
             that -- *we tell trial jurors, of course, that they cannot consider the*
20             *punishment or the consequence that Congress has set for these things.*
             *We'd ask you to also abide by that.*  We want you to make a business-like
21             decision of whether there was a probable cause. ...

22        See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable

23   cause" would obviously leave no role for the consideration of penalty information.

24        The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

25   penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

26   United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two

27   reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context,

28   as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

1  ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized

2  consideration of penalty information.  See 474 U.S. at 263.

3       Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

4  again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

5  was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct

6  contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that a grand

7  juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

8  Vasquez:

9       The grand jury does not determine only that probable cause exists to believe
         that a defendant committed a crime, or that it does not.  In the hands of the
10       grand jury lies the power to charge a greater offense or a lesser offense;
         numerous counts or a single count; and perhaps most significant of all, a
11       capital offense or a non-capital offense – all on the basis of the same
         facts.  Moreover, "[t]he grand jury is not bound to indict in every case
12       where a conviction can be obtained."

13  474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly,

14  J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only

15  the initial decision to indict, but also significant decisions such as how many counts to charge and whether

16  to charge a greater or lesser offense, including the important decision whether to charge a capital crime.").

17  Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict."

18  See id. at 264.  Judge Burns's grand jury is not Vasquez's grand jury.  The instructions therefore represent

19  structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand

20  jury proceeding."  See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must

21  therefore be dismissed.  Id.

22       The Navarro-Vargas II majority's faith in the structure of the grand jury is not a cure for the

23  instructions excesses.  The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

24  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

25  decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may

26  have on a grand jury because "it is the structure of the grand jury process and its function that make it

27  independent."  Id. at 1202 (emphases in the original).

28       Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

1   'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

2   of many of its decisions -- sufficiently protects that power."  See id. at 1214 (Hawkins, J., dissenting).  The

3   flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

4   making a probable cause determination ... unconstitutionally undermines the very structural protections that

5   the majority believes save[] the instruction."  Id.  After all, it is an "'almost invariable assumption of the law

6   that jurors follow their instructions.'"  Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that

7   "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

8   in Vasquez.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous

9   instructions because nothing will happen if they disobey them."  Id.

10          In setting forth Judge Hawkins' views, Mr. Arredondo-Ortiz understands that Judge Burns may not

11  adopt them solely because the reasoning that supports them is so much more persuasive than the majority's

12  sophistry.  Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

13          Here, again, the question is not an obscure interpretation of the word "should", especially in light

14  of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the

15  Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the

16  right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both

17  Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

18          Judge Burns did not limit itself to denying the grand jurors the power that Vasquez plainly

19  states they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

20  prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...."  See Ex.

21  A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot embolden

22  grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience

23  of the community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury

24  exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government

25  by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 &

26  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on their own

27  initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge

28  Burns has both fashioned his own rules and enforced them.

**D.    The Instructions Conflict with Williams' Holding That There Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

In Williams, the defendant, although conceding that it was not required by the Fifth Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law. See 504 U.S. at 45, 51. Williams held that "as a general matter at least, no such 'supervisory' judicial authority exists." See id. at 47. Indeed, although the supervisory power may provide the authority "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by Judge Burns and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." Id. at 47 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure." Id. at 50. As a consequence, Williams rejected the defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law. See id. at 51-55.

Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex. A at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See id. at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See Navarro-Vargas, 408 F.3d at 1207.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20. Thus, once again,

1    the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

2    probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

3    would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they

4    should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

5    will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

6    cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most

7    instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

8    you to do if they're aware of that evidence."  See id.  Moreover, during voir dire, Judge Burns informed the

9    jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or

10    that cuts against the charge, you'll be informed of that.  *They have a duty to do that*."  See Ex. B at 14-15

11    (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by the

12    "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from

13    of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."

14    See Ex. A at 27.

15            These instructions create a presumption that, in cases where the prosecutor does not present

16    exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

17    exculpatory evidence was presented, would proceed along these lines:

18            (1)    I have to consider evidence that undercuts probable cause.

19            (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any

20                   such evidence to me, if it existed.

21            (3)    Because no such evidence was presented to me, I may conclude that there is none.

22            Even if some exculpatory evidence were presented, a grand juror would necessarily presume that

23    the evidence presented represents the universe of all available exculpatory evidence; if there was more, the

24    duty-bound prosecutor would have presented it.

25            The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

26    prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

27    probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

28

1  of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

2  the Fifth Amendment.

3                                              **IV.**

4                    **REQUEST FOR LEAVE TO FILE FURTHER MOTIONS**

5          Mr. Armenta-Leyva and defense counsel have received seventy-seven pages of discovery in this

6  case.  As new information surfaces due to the government providing discovery in response to these motions

7  or an order of this Court, defense will find it necessary to file further motions, or to supplement existing

8  motions with additional facts.  Therefore, defense counsel requests the opportunity to file further motions

9  based upon information gained from discovery.

10                                             **V.**

11                                       **CONCLUSION**

12        For the reasons stated above, Mr. Armenta-Leyva moves this Court to grant his motions.

13                                                        Respectfully submitted,

14

15  DATED:        March 20, 2008              */s/ Sara M. Peloquin*

16                                            **SARA M. PELOQUIN**
                                              Federal Defenders of San Diego, Inc.

17                                            Attorneys for Jose Manuel Armenta-Leyva

18

19

20

21

22

23

24

25

26

27

28